IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

RICHARD DREW, as Independent )
Administrator of the Estate of H.D., a minor, )
now deceased, )
    Plaintiff, )
     )
v. )   Case No. 24-cv-3292
     )
NANCY COLLINS, et al., )
    Defendants. )

**OPINION**

**COLLEEN R. LAWLESS, United States District Judge:**

Before the Court is the Motion of Defendants Nancy Collins, Lindia Holmes, Jessica Hendrick, and William Hedger to Dismiss Plaintiff's Complaint. (Doc. 40). Defendants Kemmerer Village, Inc., Kristie Hebenstreit, and Chris Brizendine also filed a Motion to Dismiss or for a more Definite Statement. (Doc. 15).

**I.    PARTIES AND CLAIMS**

H.D. was born in 2019 and tragically died on October 21, 2022, at the age of 3 years old. Plaintiff Richard Drew is the Independent Administrator of the Estate of H.D. (Doc. 1 at ¶ 2). At all relevant times, Defendant Nancy D. Collins was a Child Welfare Specialist employed by the Illinois Department of Children and Family Services ("DCFS") and held a Child Welfare Employee License ("CWEL") issued by the State of Illinois. (*Id.* at ¶ 3). Defendant Lindia A. Holmes was a Public Service Administrator employed by DCFS and duly licensed by the State of Illinois with a CWEL. (*Id.* at ¶ 4). Defendant William Hedger was a Child Protection Specialist employed by DCFS and duly licensed by the State with

a CWEL. (*Id.* at ¶ 5). Defendant Jessica Hendrick was a Child Protection Advanced Specialist employed by DCFS and duly licensed by the State with a CWEL. (*Id.* at ¶ 6). The Court will refer collectively to the aforementioned Defendants as "DCFS Defendants."

Defendant Kemmerer Village is an Illinois corporation with its principal office in Taylorville, Illinois, and does business as Kemmerer Village Community Services, where it provides foster care and other services in Christian County, Illinois. (*Id.* at ¶ 8). Defendant Kristie Hebenstreit was a caseworker and Defendant Chris Brizendine was a caseworker supervisor employed by Kemmerer Village at all relevant times. (*Id.* at ¶¶ 9-10). The Court will collectively refer to these defendants as the Kemmerer Village Defendants. Kemmerer Village Defendants acted under color of law pursuant to a contract with DCFS or otherwise were allowed by DCFS to conduct and participate in investigations of child abuse or neglect. (*Id.* at ¶¶ 19, 203).

Defendant Christopher Gunn was the biological father of H.D. and Defendant Ashley Bottoms a/k/a Ashley Gunn was the wife of Christopher Gunn and lived in the same residence as Christopher Gunn and H.D. Ashley was the daytime caretaker to H.D. (*Id.* at ¶¶ 11-12).

Plaintiff alleges each Defendant knew or suspected that H.D. was at risk of physical abuse and serious neglect while in the custody of his father and stepmother. (*Id.* at ¶ 17). DCFS Defendants knew or suspected Ashley Bottoms had six prior reports of abuse or neglect, including physical abuse of children. Specifically, prior to October 20,

2022, the DCFS Defendants and Kemmerer Village Defendants knew Bottoms had physically abused H.D. prior to killing him. (*Id.* at ¶ 18).

Count I of Plaintiff's Complaint alleges Fourteenth Amendment violations against the DCFS Defendants under 42 U.S.C. § 1983. Count II asserts Fourteenth Amendment violations against the Kemmerer Village Defendants under § 1983. Counts III through XXI consist of state law claims asserted against the various Defendants.

## II.     FACTUAL ALLEGATIONS

On or about April 6, 2022, H.D.'s mother and father were both found to be unfit and unable to care for, protect, train, educate, supervise, or discipline the minor so that the placement of the minor with either biological parent was determined to be contrary to the health, safety, and best interests of the child. (*Id.* at ¶ 26). On or about April 6, 2022, DCFS took protective custody and made H.D. a ward of the court. (*Id.* at ¶ 27). H.D. was placed in the care and custody of his maternal uncle, Kiel Quigley, under whose care H.D. thrived. (*Id.* at ¶ 28).

On or about April 25, 2022, Kemmerer Village Defendants recommended H.D. be removed from the care and custody of Kiel Quigley and be placed with Defendants Gunn and Bottoms. (*Id.* at ¶ 29). Thereafter, on or about August 20, 2022, DCFS removed H.D. from placement with Quigley and placed H.D. in the temporary custody and care of Gunn and Bottoms. (*Id.* at ¶ 30). Plaintiff alleges that prior to August 20, 2022, Defendant Bottoms had a history of child abuse that was known or should have been known to DCFS Defendants and Kemmerer Village Defendants. Plaintiff cites six different reports of abuse involving Bottoms between June of 2018 and December of 2019. (*Id.* at ¶ 31).

Furthermore, Bottoms had other prior involvement with DCFS when one of her children was born with methamphetamine in her system. (*Id.* at ¶ 32). Plaintiff alleges it was known to and/or suspected by the DCFS Defendants and Kemmerer Village Defendants, through prior reports, observation, and investigation of reports of child abuse, that Bottoms posed a real and immediate threat to the safety and welfare of the minor. (*Id.* at ¶ 33).

At all relevant times, Christopher Gunn had a history of dangerous drug use and reported child abuse that was known to and/or suspected by all Defendants to pose a real and immediate threat to the safety and welfare of the minor. (*Id.* at ¶ 34). Plaintiff alleges that, following the placement with Defendants Gunn and Bottoms on or about August 20, 2022, and prior to H.D.'s death, multiple reports were made concerning the safety and suspected abuse of H.D. while in the custody of Gunn and Bottoms but he remained in their custody. (*Id.* at ¶¶ 35-36).

Defendants Hebenstreit and Brizendine were assigned to investigate and make recommendations as to the safety, custody, and care of H.D. (*Id.* at ¶ 37). Plaintiff alleges Hebenstreit conducted a sham investigation, omitted information from her report, inserted false information in her report of her investigation, and otherwise created an inaccurate report. (*Id.* at ¶ 38). In supervising and reviewing Hebenstreit's work, Brizendine and Hebenstreit conferred and conspired in their sham investigation and/or creation of a false and inaccurate report. (*Id.* at ¶¶ 39-40). Both Defendants knew or suspected Bottoms posed a threat to the safety and security of H.D., based in part on prior reports concerning her actions and the safety of children. (*Id.* at ¶ 41). On September 20,

2022, Hebenstreit prepared a permanency hearing report, which was reviewed and approved by Brizendine. According to Plaintiff, the report purposefully omitted information regarding Bottoms, the knowledge or suspicion of the danger she posed to H.D., and inserted false information in his report of the investigation. (*Id.* at ¶ 42).

Defendants Collins and Holmes were assigned to oversee the DCFS case involving the safety, custody, and care of H.D. (*Id.* at ¶ 43). They knew Bottoms was the live-in paramour of Gunn and knew or suspected Bottoms posed a threat to the safety and security of H.D., based in part on the many prior reports concerning her and the safety of children. (*Id.* at ¶ 44). Plaintiff alleges Collins conducted a sham investigation, omitted information from her report, or inserted false information in her report of her investigation, or otherwise created an inaccurate report. (*Id.* at ¶ 45). In supervising and reviewing Collins's work in conformance with DCFS procedures, Holmes and Collins conferred and conspired in their sham investigation and creation of a false and inaccurate report. (*Id.* at ¶¶ 46-47). Despite their knowledge or suspicion of the harm posed to H.D.'s safety if removed from his uncle's custody and placed with Gunn and Bottoms, Collins and Holmes consciously ignored and failed to stop the removal of H.D. from the safety of his uncle's custody and the placement of H.D. with Gunn and Bottoms. (*Id.* at 48).

On or about October 14, 2022, DCFS was contacted regarding an allegation of abuse of H.D. by Bottoms. The child was observed with new injuries that were not present the day before, to include: a "goose egg" on his forehead, a bruise over his eye, a bruise near his sternum, a bruise on his shin, a scratch near his ear, a bruise near his jaw, and scratches to his lower back. When asked if Bottoms had hit him, H.D. nodded his head

while crying and said he did not want to go home. (*Id.* at ¶ 49). The same day, Defendant Hedger was assigned to investigate the allegation of abuse to ensure Gunn and Bottoms were the appropriate custodial parents of H.D. (*Id.* at ¶ 50). Plaintiff alleges Hedger conducted a sham investigation, wherein he purposefully omitted information from his report or inserted false information. (*Id.* at ¶ 51). Even though Hedger knew or suspected H.D. was at risk for abuse while in the custody of Gunn and Bottoms, he consciously ignored and failed to stop the placement of H.D. with them. (*Id.* at ¶ 52). In supervising and reviewing Hedger's work in conformance with DCFS procedures, Hendrick and Hedger conferred and conspired in their sham investigation and creation of a false and inaccurate report. (*Id.* at ¶ 53-54).

On or about October 14, 2022, Hebenstreit spoke with Hedger and Hendrick regarding H.D.'s court-ordered placement and noted previous instances where H.D. presented with bruising. (*Id.* at ¶ 55). Even though Hebenstreit knew or suspected H.D. was at risk for abuse while in the custody of Gunn and Bottoms, he consciously ignored and failed to stop the placement of H.D. with Gunn and Bottoms. (*Id.* at ¶ 56). Even though Hendrick knew or suspected that Hedger had conducted a sham investigation and created a false and inaccurate report and that H.D. was at a risk for abuse if placed in the custody of Gunn and Bottoms, Hendrick nevertheless approved, authorized, and directed the placement of H.D. in the custody of Gunn. (*Id.* at ¶ 57).

On October 14, 2022, in response to the allegation of abuse of H.D. by Bottoms, Hedger directed H.D.'s father to take him to the hospital for an evaluation by an emergency room doctor on the causes of H.D.'s injuries, which included a bloody fat lip,

bruising on his forehead, left eye, left shin, and a scratch near his left ear. (*Id.* at ¶ 58). Hedger was told the doctor who examined H.D. on that date was unable to determine the cause of H.D.'s injuries and could not rule out abuse. (*Id.* at ¶ 59). Nonetheless, Hedger returned H.D. to the custody of Gunn and Bottoms. (*Id.* at ¶ 60).

On October 20, 2022, H.D. was brought to OSF Saint Francis Medical Center. Upon his arrival, H.D. was noted to be in full cardiac arrest. First responders intubated H.D. and administered CPR for approximately 25 minutes. Hospital staff attempted to resuscitate H.D. for approximately 41 minutes. (*Id.* at ¶ 61). H.D. was pronounced dead at 5:40 p.m. on October 20, 2022. (*Id.* at ¶ 62). An autopsy of H.D.'s body found blunt force injuries of the head and upper body, multiple hemorrhages, a cerebral contusion, and contusions of the neck, chest, back, and extremities. (*Id.* at ¶ 63). The autopsy concluded that H.D.'s cause of death was the result of blunt force injuries of the head. (*Id.* at ¶ 64).

On April 13, 2023, Ashley Bottoms pled guilty to involuntary manslaughter of H.D. Bottoms was sentenced to 11 years in prison in July of 2023. (*Id.* at ¶ 65). Plaintiff contends that, as a direct and proximate result of the acts or omissions of DCFS Defendants and Kemmerer Village Defendants, Ashley Bottoms killed H.D. on October 20, 2022, by violently pushing or throwing the minor from the couch, causing him to strike his head on a piece of furniture, which resulted in his death. (*Id.* at ¶ 68).

### III.   DISCUSSION

DCFS Defendants' Motion to Dismiss seeks dismissal of the § 1983 claims against the individual Defendants under the Supreme Court's ruling in *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189 (1989), wherein the Court concluded, generally,

that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. Additionally, even if Plaintiff's claims are not barred by *DeShaney*, DCFS Defendants contend they are entitled to qualified immunity. In response, Plaintiff argues the state-created danger exception to *DeShaney* applies and Defendants are not entitled to qualified immunity.

### A. Legal Standard

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint. *See Christensen v. Cnty. of Boone, Ill.*, 483 F.3d 454, 458 (7th Cir. 2007). When considering a motion to dismiss under Rule 12(b)(6), the court construes the complaint in the light most favorable to the plaintiff, accepting all well-pleaded allegations as true and construing all reasonable inferences in plaintiff's favor. *Id.* To state a claim for relief, a plaintiff need only provide a short and plain statement of the claim showing she is entitled to relief and giving defendants fair notice of the claims. *Maddox v. Love*, 655 F.3d 709, 718 (7th Cir. 2011). However, the complaint must set forth facts that plausibly demonstrate a claim for relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). A plausible claim is one that alleges factual content from which the court can reasonably infer that defendants are liable for the misconduct alleged. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Merely reciting the elements of a cause of action or supporting claims with conclusory statements is insufficient to state a claim. *See id.* The complaint must do more than assert a right to relief that is "speculative." *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

### B. *DeShaney v. Winnebago County Dep't of Social Services*

In *DeShaney*, the Supreme Court considered whether social workers and other local officials deprived the plaintiff of his liberty in violation of the Due Process Clause when they had reason to believe he was being abused by his father but did not act to remove him from his father's custody. *DeShaney*, 489 U.S. at 191. The plaintiff, who was a toddler when the authorities first learned he might be a victim of abuse, was beaten and permanently injured by his father. *Id.* Upon first learning of the accusations of abuse, social services officials interviewed the father, who denied the allegations, and the officials did not pursue the matter. *Id.* at 192. One year later, the child was admitted to the hospital with multiple bruises and abrasions. *Id.* After the examining physician notified social services of the suspected abuse, the juvenile court placed the plaintiff in the temporary custody of the hospital. *Id.* Three days later, an ad hoc "Child Protection Team" consisting of social workers and other officials considered the plaintiff's situation and determined there was insufficient evidence of child abuse to maintain custody of him. *Id.* The team recommended several measures to protect plaintiff, which included enrolling him in a preschool program and providing his father with counseling services. *Id.* Plaintiff's father entered into a voluntary agreement with social services wherein he promised to cooperate in achieving the goals. *Id.*

Based on the team's recommendation, the juvenile court dismissed the child protection case and returned plaintiff to his father's custody. *Id.* The following month, emergency room personnel informed the social worker handling plaintiff's case that plaintiff had once again been treated for suspicious injuries. *Id.* The caseworker

determined there was no basis to take action. *Id.* During the following six months, the caseworker made monthly visits to plaintiff's home, wherein she observed a number of suspicious injuries on plaintiff's head. *Id.* at 192-93. While the caseworker recorded these incidents in her files and noted her continuing suspicions that the child was being physically abused, she did nothing else. *Id.* at 193. Soon thereafter, the emergency room notified social services that plaintiff had once again been treated for injuries believed to be caused by child abuse. *Id.* On the caseworker's following two visits to the DeShaney home, she was told the child was too ill to see her. *Id.* The social services department took no action. *Id.*

A few months later, the plaintiff's father beat the 4-year-old so severely that he fell into a life-threatening coma. *Id.* Plaintiff underwent emergency brain surgery, which revealed a series of hemorrhages caused by traumatic head injuries that were inflicted over a lengthy period. *Id.* Plaintiff suffered brain damage so severe that he likely would never be able to live independently. *Id.* Plaintiff's father was convicted of child abuse. *Id.*

The minor child and his mother brought suit asserting the defendants "had deprived Joshua of his liberty without due process of law, in violation of his rights under the Fourteenth Amendment, by failing to intervene to protect him against a risk of violence at his father's hands of which they knew or should have known." *Id.* In considering the plaintiff's due process claim, the Supreme Court first observed that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.* at 195. The language of the Due Process Clause limits the State's power to act and does not guarantee

certain minimal levels of safety and security. *Id.* While the language prohibits the State from violating certain rights without "due process of law," it does not extend "to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.*

The Court further noted that history does not support such an expansive reading of the Due Process Clause. *Id.* "Its purpose was to protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 196. The "democratic political processes" determine the government's obligation when it comes to protecting people from each other. *Id.* "As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.

The Court then considered the plaintiff's argument that, even if the Due Process Clause imposes no affirmative obligation on the State to protect the public, such a duty may arise out of certain "special relationships" created or assumed by the State as to particular individuals. *Id.* While the "Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals," such as "incarcerated prisoners" and "involuntarily committed mental patients," the Court concluded it imposed no such obligation on the State as to the plaintiff. *Id.* at 197-98. The Court observed:

> While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than

> that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect Joshua.

*Id.* at 201. The Due Process Clause "does not transform every tort committed by a state actor into a constitutional violation." *Id.* at 202. Even though the State's failure to protect plaintiff from his father's violence is "calamitous in hindsight," it had no constitutional duty to do so. *Id.*

The DCFS Defendants contend *DeShaney* compels the outcome in this case because the facts here are materially indistinguishable from those in *DeShaney*. They allege neither the "special relationship" exception nor the "state-created danger" exception applies. Plaintiff asserts the state-created danger exception applies and the motion to dismiss should be denied on that basis.

### C. State-Created Danger

The Seventh Circuit has explained that the exception under *DeShaney* for state-created dangers is a narrow one. *See First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 988 (7th Cir. 2021). It applies when the state creates or increases a danger to a person. *Doe v. Village of Arlington*, 782 F.3d 911, 917 (7th Cir. 2015). "When courts speak of the state's increasing the danger of private violence, they mean the state did something that turned a potential danger into an actual one, rather than just stood by and did nothing to prevent private violence." *Id.* (internal quotation marks and citation omitted). This exception, which applies when the state "affirmatively places a particular individual in a position of danger the individual would not otherwise have faced," is

understood to derive from the language in *DeShaney* that, "although the county and its social workers may have been aware of the dangers the child faced in his father's home, they played no part in the creation of those dangers." *First Midwest Bank*, 988 F.3d at 988. (internal quotation marks and citations omitted). This exception "arises only by implication from a brief observation in the Court's opinion." *Id.* at 988. The Justices "hinted that the Constitution *might* support liability when a state has a duty that 'arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.'" *Weiland v. Loomis*, 938 F.3d 917, 921 (7th Cir. 2019) (quoting *DeShaney*, 489 U.S. at 200).

For the exception to apply, the plaintiff "must show that the state affirmatively placed him in a position of danger and that the state's failure to protect him from that danger was the proximate cause of his injury." *First Midwest Bank*, 988 F.3d at 988. To meet the proximate-cause requirement, "the state-created danger must entail a foreseeable type of risk to a foreseeable class of persons." *Id.* at 988-89. "A generalized risk of indefinite duration and degree is insufficient." *Id.* at 989. Given that the right to protection against state-created danger is derived from the substantive component of the Due Process Clause, "the state's failure to protect the plaintiff must shock the conscience." *Id.* Only "the most egregious official conduct" will meet this threshold. *Id.*

The Seventh Circuit has also noted "the state-created danger exception" does not tell a public employee what to do, or avoid, in particular situations. *See Weiland*, 938 F.3d at 919. It is a principle of liability and not a doctrine concerning primary conduct. *Id.* The

court in *Weiland* described the facts in *DeShaney* and observed: "No one could have doubted that the child-welfare officials' decision increased Joshua's danger, compared with his safety in the hospital—indeed, that increase was the foundation of his claim for damages—but the Supreme Court nonetheless held that the Due Process Clause of the Fourteenth Amendment does not require a state to protect its residents from private violence." *Id.* Courts cannot create an "exception" to *DeShaney* that contradicts this principle and, therefore, the "state-created danger exception" cannot be treated "as a rule of primary conduct forbidding any acts of public officials that increase private dangers." *Id.* Courts should be cognizant of not reaching a result that would have justified liability in *DeShaney*. *Id.* at 921.

Furthermore, the Cout finds Plaintiff's conclusory allegations regarding a sham investigation, falsified reports, and omission of information from their reports do not constitute well-pleaded facts; without more, they are unactionable legal conclusions. *Wright v. Shumate*, 2024 WL 689990, at *4 (N.D. Ill. Feb. 20, 2024); *Gatz v. Fabian*, 2025 WL 327934, at *13 (N.D. Ill. Jan. 29, 2025) ("Indeed, claims of falsified reports and omitted facts, without allegations of what Defendants falsified or omitted from the reports, are conclusory.") (internal quotation marks and citation omitted).

*DeShaney* and this case both involve unspeakable tragedies which likely could have been avoided if certain individuals had acted when warning signs emerged. However, there were arguably more warning signs in *DeShaney* than there were here as to H.D. *DeShaney* included the following signs of abuse: (1) before the juvenile court returned the plaintiff to his father's custody, a physician notified social services of

suspected abuse; (2) emergency room personnel informed the social worker that plaintiff had been treated for suspicious injuries; (3) the caseworker observed a number of suspicious injuries on plaintiff's head during home visits; (4) emergency room workers again notified social services that plaintiff had been treated for injuries believed to have been caused by child abuse; and (5) on two home visits, the caseworker was told plaintiff was too ill to see her. *See DeShaney*, 489 U.S. at 192-93. Despite all these warning signs, the social services department took no action. *Id.* at 193.

Plaintiff attempts to distinguish this case from *DeShaney* by noting H.D. was placed in the care and custody of his uncle, Kiel Quigley, before being removed to the custody of Gunn and Bottoms. Plaintiff does not say how that is different from the plaintiff in *DeShaney* being removed from the temporary custody of the hospital. Both Joshua DeShaney and H.D. were removed from the custody of non-abusive guardians and placed in the custody of abusive guardians. In both cases, there were signs that abuse was occurring. However, *DeShaney* tells us "the State does not become the permanent guarantor of an individual's safety by having once offered him shelter." *DeShaney*, 489 U.S. at 201.

As for H.D., Plaintiff claims there were numerous warning signs that Gunn and Bottoms were unfit parents prior to H.D.'s placement with them, including five different reports of abuse involving Bottoms in the four years prior to H.D.'s placement. However, the Complaint indicates the five prior reports of alleged child abuse by Bottoms were deemed to be unfounded. Plaintiff cites the October 14, 2022 allegation of abuse that was referred to DCFS after H.D. was observed with scratching and bruising on his forehead,

sternum, shin, ear, jaw, and lower back. H.D. also informed DCFS workers that Bottoms had hit him. Plaintiff alleges the DCFS Defendants were aware of previous instances when H.D. presented with bruising. In response to the October 14 incident, Defendant Hedger directed H.D.'s father to take H.D. to the hospital in order for an emergency room doctor to determine the causes of H.D.'s injuries. The doctor was unable to determine the cause of H.D.'s injuries but could not rule out abuse. Six days later, H.D died after sustaining blunt force injuries to the head.

In *DeShaney*, there was no liability even after a physician informed social workers of suspected abuse and after emergency room personnel notified social workers on multiple occasions of suspected injuries due to child abuse. The caseworker also observed suspicious injuries on the plaintiff on one occasion and was unable to see him on two occasions because he was "too ill." Here, H.D. was observed with multiple injuries less than a week before he died but, even then, the doctor could not definitively determine the cause of his injuries.

As previously noted, the facts suggesting abuse that were known to caseworkers in *DeShaney* were arguably more egregious than those known to caseworkers in this case. At the very least, it is difficult to distinguish which case had more indicators of child abuse. If there was no liability in *DeShaney*, there can be no liability here. *See, e.g., Weiland*, 938 F.3d at 921 ("Every once in a while, a court should step back and ask whether local jurisprudence matches the instructions from higher authority. If taken literally, the approach that *Johnson* [*v. Rimmer*, 926 F.3d 695 (7th Cir. 2019)] attributes to *King* [*v. East St. Louis School Dist.*, 496 F.3d 812 (7th Cir. 2007)] would have justified liability in

*DeShaney*."). At most, it could be said that defendants in *DeShaney* and Defendants here did nothing upon observing signs of child abuse. However, that is not enough to trigger the "narrow" *DeShaney* state-created dangers exception. "A plaintiff must show that the state affirmatively placed him in a position of danger." *First Midwest Bank*, 988 F.3d at 988. Both H.D. and Joshua DeShaney were already in positions of danger. Based on the reasoning of *DeShaney*, the Court dismisses the § 1983 claims against the DCFS Defendants.

### D. Qualified Immunity

Having determined that the § 1983 claims are subject to dismissal under *DeShaney*, the Court is not required to address DCFS Defendants' request for the claims to be dismissed on qualified immunity grounds. The Court will simply note that it appears qualified immunity would apply in this case. Plaintiff does not cite a single analogous case which suggests the DCFS Defendants violated a clearly established constitutional right. In fact, the most analogous case to the present case is *DeShaney*, which would suggest to Defendants they were not violating a clearly established constitutional right. Therefore, even if Plaintiff's § 1983 claims were not already subject to dismissal, the claims would be barred by qualified immunity.[1]

---

[1] Plaintiff claims it is premature to address qualified immunity at the pleading stage. However, determining whether defendants are entitled to qualified immunity at this stage is consistent with the Supreme Court's directive to resolve immunity issues at the earliest possible time "because qualified immunity protects government officials from both litigation and liability." *Sabo v. Erickson*, 128 F.4th 836, 842-43 (7th Cir. 2025)

### E. Motion to Dismiss of Kemmerer Village Defendants

Defendants Kemmerer Village, Inc., Kristie Hebenstreit, and Chris Brizendine have filed a Motion to Dismiss or for a more Definite Statement. The Kemmerer Village individual Defendants seek dismissal of the § 1983 claims in Count II because Plaintiff failed to allege Defendants proximately caused a deprivation of H.D.'s constitutional rights. In seeking dismissal, the Kemmerer Village Defendants rely on *DeShaney* to argue the alleged conduct of the Kemmerer Village Defendants did not create or increase a danger to H.D. such that it had an affirmative duty to protect him. For the reasons noted in addressing the DCFS Defendants' Motion, the Court dismisses the § 1983 claims as to the Kemmerer Village Defendants. Those claims would also be subject to dismissal on qualified immunity grounds for the reasons previously noted.

### IV. CONCLUSION

For all of these reasons, the Court concludes Plaintiff is unable to state a plausible claim based on the state-created danger exception to *DeShaney* and, even if he could, Defendants would be entitled to qualified immunity on the § 1983 claims. Because the Court finds that amendment of the complaint as to the § 1983 claims would be futile, those claims will be dismissed with prejudice. The dismissal of the federal claims does not mean that Plaintiff does not have viable state tort law claims. The normal practice within the Seventh Circuit is that, if all federal claims are dismissed before trial, the district court should relinquish jurisdiction over any supplemental state law claims "in order to minimize federal judicial intrusion into matters of purely state law." *Burritt v.*

*Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015); *see also* 28 U.S.C. Sec 1367(c)(3). The Court finds no basis to depart from that general practice.

Therefore, the Motion to Dismiss of Defendants Nancy Collins, Lindia Holmes, Jessica Hendrick, and William Hedger [Doc. 40] is GRANTED as to Count I. The Motion to Dismiss of Defendants Kemmerer Village Inc., Kristie Hebenstreit, and Chris Brizendine [Doc. 15] is GRANTED as to Count II. Counts I and II are Dismissed with Prejudice. The Court relinquishes jurisdiction over Counts III-XXI. Those counts are Dismissed without Prejudice. The Crossclaim for Contribution [Doc. 61] filed by Defendants Kemmerer Village, Hebenstreit, and Brizendine against the remaining Defendants is also Dismissed without Prejudice. The Clerk is Directed to terminate as moot Plaintiff's Motion to Compel [Doc. 62], Defendants Collins, Hedger, Hendrick, and Holmes's Motion to Dismiss Crossclaim [Doc. 69], and Defendant Christopher Gunn's Motion to Dismiss Crossclaim [Doc. 76]. Upon entry of judgment, the Clerk will terminate this case.

ENTER: September 30, 2025

_____
COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE